UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
JERROLD R. BLACK,                                            :
                                                             :
                              Plaintiff,                     :
                                                             :               05 Civ. 108 (GEL)
        -v.-                                                 :
                                                             :          **OPINION AND ORDER**
PITNEY BOWES INC., PITNEY BOWES INC.                         :
LONG-TERM DISABILITY PLAN, and                              :
PITNEY BOWES INC. EMPLOYEE BENEFITS                          :
COMMITTEE,                                                   :
                                                             :
                              Defendants.                    :
                                                             :
-------------------------------------------------------------x

Christopher P. Foley, McCormick Dunne & Foley,
New York, NY, for plaintiff.

Jennifer B. Hein, Nicole A. Diller, Morgan, Lewis &
Bockius LLP, New York, NY, for defendants.


GERARD E. LYNCH, District Judge:

        Plaintiff Jerrold Black brings this action pursuant to the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., challenging denials of disability

benefits by defendant Pitney Bowes Inc., his employer, defendant Pitney Bowes Inc. Long-Term

Disability Plan, its employee benefits plan, and defendant Employee Benefits Committee of

Pitney Bowes, Inc., the plan administrator.  Both sides move for summary judgment, or in the

alternative, judgment on the administrative record.  For the following reasons, plaintiff's motion

will be granted in part and denied in part, and defendants' motion will be granted in part and

denied in part.

# BACKGROUND

## I.      Factual and Procedural History

On October 2, 2003, plaintiff Jerrold Black, who had been employed as a technician for defendant Pitney Bowes Inc. ("Pitney Bowes") for over 25 years, stopped working and sought short-term disability ("STD") benefits from his employer, pursuant to its short-term disability policy (the "STD Policy" or the "Policy").  (STD Adm. Rec. 34, 56-57.[1])  Black's claim was accompanied by a diagnosis from his primary care physician, Dr. Matthew Miller, who reported that Black suffered from "anxiety" and "depression" that prevented Black from being able to "perform his job currently."  (Id. 34.)  Black's application was evaluated by ValueOptions, a company engaged by Pitney Bowes, which in turn retained Dr. Gabrielle Stutman, a psychologist, to assess Black's condition.[2]  (Pl. R. 56.1 Statement ¶ 3.)  On October 21, ValueOptions reviewed Dr. Miller's diagnosis and Dr. Stutman's assessment and recommended STD benefits for two weeks in addition to the three weeks that had passed since Black had stopped working.  (Id. 47)  Pitney Bowes accepted this recommendation and approved short-term disability benefits through November 5, 2003.  (Id. 31.)

---

[1] All facts are taken from the administrative records developed in connection with Black's application for short-term disability benefits (the "STD Adm. Rec.") and for long-term disability benefits (the "LTD Adm. Rec."), attached as Exhibits A and B, respectively, to the Declaration of Nicole A. Diller.  Page numbers in citations to these records refer to the Bates stamp numbers appearing on each page.

[2] Defendants assert that ValueOptions Associate Medical Director Dr. Frank Webster conducted the assessment (see Def. Mem. 3), but this appears to be incorrect.  Dr. Stutman's name, not Dr. Webster's, appears next to "Assessor's Name & Discipline" on the first page of the form (see STD Adm. Rec. 36), and nothing else in the record supports defendants' contention.

On November 10, ValueOptions recommended rejecting Black's request to extend his disability benefits period, and Pitney Bowes accepted that recommendation as well. (Id. 32, 33, 48.) Black appealed this decision, supported by another letter from Dr. Miller as well as a letter from his dentist. (Id. 49, 50-51, 52.) Pitney Bowes denied the appeal, contending that Black's "level of anxiety does not support extension" of benefits. (Id. 49, 53.)

A year later, in November 2004, Black applied for long-term disability ("LTD") benefits pursuant to the Pitney Bowes Inc. Long-Term Disability Plan (the "LTD Plan" or the "Plan"). (LTD Adm. Rec. 158-59.) Black's application for LTD benefits included a diagnosis from Dr. Neil Berliner, a psychiatrist, that Black suffered from a "panic disorder," that he was "unable to work because of this disability," and that it was uncertain when he would be "able to perform usual work." (Id. 160.) Black also submitted a third letter from Dr. Miller, stating that Black was "currently totally disabled from work," and that it was uncertain "when or if he will be able to return to work." (Id. 96.) Finding that Black's symptoms "do not meet the definition of disability," Pitney Bowes denied Black's application. (Id. 87, 88.)

In June 2005, Black appealed this decision, submitting all the materials he had previously submitted, plus a letter from the Social Security Administration advising Black that he had been found eligible for Social Security disability benefits, and a report from Dr. Berliner recommending "continuation of current treatment and long term disability." (Id. 92, 102, 103, 104.) In response, Pitney Bowes requested additional information from Black and asked that he submit to an independent medical examination ("IME"). (Id. 185.) Black refused to provide the additional information or to submit to an IME (id. 192), and he refused again upon Pitney Bowes's renewal of the request (id. 195-96, 198).

Black's appeal was considered by defendant Pitney Bowes Inc. Employee Benefits Committee (the "Employee Benefits Committee" or the "Committee"), the administrator of the LTD Plan. (Id. 208-14.) The Committee denied the appeal, finding that Black's failure to consent to the IME and to provide additional requested information gave rise to a "procedural ground for denial of benefits," and that Black in any event had failed to provide "sufficient objective evidence" that he was disabled. (Id. 212-13.)

Black sued, seeking review and reversal of these decisions.[3] Both sides move for summary judgment or, in the alternative, judgment on the administrative record.

## II.     The Short-Term Disability Policy

The STD Policy provides that a disabled employee is entitled to a percentage of his normal pay for up to twenty-two weeks. (STD Adm Rec. 5, 10.) An employee is considered "disabled" if he suffers "a non-occupational mental or physical injury or illness which renders the Employee unable to perform the material duties of his or her own job." (Id. 5.) To initiate a claim for benefits, an employee must provide "objective medical evidence" of the "extent and nature of the Disability." (Id. 12.) In addition to such evidence, an employee is required "to submit whatever proof the Company may require . . . , including the statements of one or more duly qualified physicians or clinical psychologists." (Id.) An employee must submit to a

---

[3] Black initially filed two separate actions. The claim for STD benefits was made in state court, but removed by defendants to federal court. See Notice of Removal (Doc. #1). The claim for LTD benefits, pursuant to ERISA, was made in this Court, and was consolidated with the claim for STD benefits. See Order of July 28, 2006 (Doc. # 13). While the action for STD benefits does not present a federal question, and the amount in controversy is insufficient to sustain diversity jurisdiction, this Court has supplemental jurisdiction over the STD claim because it and the ERISA claim arise from a "common nucleus of fact." See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, (1966); 28 U.S.C. § 1367.

"medical or psychological examination or evaluation" as required by Pitney Bowes.  (Id. 14.)

In evaluating claims for STD benefits, Pitney Bowes is empowered to "interpret and construe the terms and provisions of the Policy, to apply such terms and provisions . . . , [and] to determine questions of eligibility and of the status and rights of Employees."  (Id. 16.)  The Policy provides that Connecticut law governs its construction.  (Id. 19.)

## III.   The Long-Term Disability Plan

The LTD Plan provides that a disabled employee is entitled to a percentage of his normal pay until that employee is no longer disabled, retires, or dies.  (LTD Adm. Rec. 13-14.)  An employee is considered disabled during the first twelve months of receiving benefits if he is unable "to perform the material duties of his or her own occupation," and he is considered disabled beyond that point if he is "unable . . . to engage in any gainful occupation or profession for which he is, or could become, reasonably suited by education, experience, or training."  (Id. 11.)

In order to substantiate a claim for disability, an employee must "submit initially and from time to time whatever proof or documentation the Disability Department[4] may require . . . , including the medical records and medical analysis of one or more duly qualified physicians or clinical psychologists."  (Id. 18.)  In addition, as a "condition to the payment of benefits . . . , the Disability Department shall have the right to direct such employee to submit from time to time to an independent medical examination by a licensed or board certified physician or clinical psychologist."  (Id.)

_____

[4] Although the Employee Benefits Committee is "responsible for the general administration of the Plan," it "has delegated ongoing, day-to-day administrative responsibility under the Plan to the Pitney Bowes Disability Department."  (LTD Adm. Rec. 26.)

The Employee Benefits Committee has "discretion in exercising [the power] to interpret and construe the terms and provisions of the Plan, to apply such terms and provisions as the Committee may exclusively determine, to determine questions of eligibility and of the status and rights" of participants in the plan. (Id. 26, 33-34.)

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the initial burden of explaining the basis for its motion and identifying those portions of the record which it believes "demonstrate the absence of a genuine issue of material fact." Id. at 323. The burden then shifts to the nonmovant to produce evidence sufficient to create a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e)(2). See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In evaluating a summary judgment motion, a court's responsibility is to determine if there is a genuine issue to be tried and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Shade v. Housing Auth. of

City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001).  An issue is material if it "might affect the outcome of the suit under the governing law."  Id.  A court must draw all "justifiable inferences" in the nonmovant's favor, and construe all of the facts in the light most favorable to the nonmovant.  Anderson, 477 U.S. at 255.  However, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to withstand a motion for summary judgment.  Id. at 252.

The parties have moved, as an alternative to summary judgment, for "judgment on the administrative record."  While there is no provision in the rules for this motion, a court may treat such a motion, in an ERISA action, as a request that, should summary judgment be denied, the court immediately conduct "a bench trial 'on the papers.'"  Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003).  This allows a district court to resolve factual disputes and make "explicit findings of fact" based on the administrative record.  Id.  As all the issues before the Court may be resolved on the undisputed facts, there is no need to conduct such a trial.

## II.     Short-Term Disability Benefits

Black claims that Pitney Bowes breached the terms of the STD Policy, which is a part of his employment contract, by denying him benefits.  The STD Policy is governed by Connecticut law, under which the interpretation of contract terms is normally a question of law for the court.  Smithfield Assocs., LLC v. Tolland Bank, 86 Conn. App. 14, 18 (2004).  However, where an agreement gives a party discretion to apply or interpret the terms of that agreement, a court's review of that exercise of discretion is "relatively narrow."  Wyper v. Providence Washington Ins. Co., 533 F.2d 57, 62 (2d Cir. 1976) (applying Connecticut law).  In such a situation, the "burden is on the plaintiff to show that the [exercise of discretion] was motivated by bad faith or

fraud or the result of arbitrary action." Id. Under this standard, "it is not enough to persuade a judge or jury that the decision may have been incorrect," but rather that "no reasonable basis" existed for the decision made by the party exercising discretion. Gehrhardt v. General Motors Corp., 581 F.2d 7, 11 (2d Cir. 1978) (applying same standard under New York law).

Here, the STD Policy confers wide discretion on Pitney Bowes, empowering it to "interpret and construe the terms and provisions of the Policy, to apply such terms and provisions . . . , [and] to determine questions of eligibility and of the status and rights of Employees." (STD Adm. Rec. 16.) Accordingly, Pitney Bowes breached its obligations under the STD Policy only if its decision was a result of bad faith, fraud, or arbitrary action.

The undisputed evidence establishes that Pitney Bowes's decisions to grant Black benefits only until November 5, 2003, and to refuse to extend them thereafter were arbitrary and contrary to its obligations under the STD Policy. The Policy required Pitney Bowes to find Black "disabled" if it determined that his injury rendered him "unable to perform the material duties of his . . . job." (Id. 5.) There was considerable unrefuted evidence that Black's panic attacks and anxiety rendered him "disabled," which Pitney Bowes overlooked, mischaracterized, or unjustifiably discounted.

The assessments of Dr. Miller and Dr. Stutman offer substantial evidence of Black's disability. Dr. Miller's letter in support of Black's initial application for STD benefits reported that Black was suffering from "anxiety" and "depression" and that Black was "unable to perform his job currently." (Id. 34.) Dr. Miller's report is cursory, but its shortcomings are more than addressed by the thorough assessment submitted by Dr. Stutman, the psychologist hired by Pitney Bowes to evaluate Black's condition. Dr. Stutman reported that Black was experiencing

8

"anxiety attacks" that caused a number of symptoms including "hyperventilation," difficulty concentrating, "tingling in extremities," "dizziness," "wobbl[iness] in legs," and "chestpain." (Id. 36.) According to Dr. Stutman, the anxiety was the manifestation of a "delayed" post-traumatic stress disorder that resulted from the death of Black's brother-in-law on 9/11 and a "loss of emotional stability/security" that Black experienced as a result of the terrorist attacks.[5] (Id. 41.) The assessment reported that Black had been experiencing anxiety attacks for over a year and a half, and that they had increased in intensity within the last several months. (Id. 36.)

Dr. Stutman found that when panicked, Black suffered "severe" impairment of his ability to perform complex tasks, make decisions without supervision, and accept and carry out responsibility for planning. (Id. 40.) It also found "marked" impairment of his ability to influence others and interact with customers and the public. (Id.) The assessment noted that prior to the onset of Black's anxiety, he "love[d]" his job and had no workplace issues or problems. (Id. 39.) However, with the onset of the anxiety, Black had been subject to repeated disciplinary actions for "[u]nsatisfactory attendance," including "[v]erbal counseling," a "[w]ritten warning," and a "[f]inal warning," which had put his "job in jeopardy." (Id.) The assessment concluded that Black was "unable (temporarily) to perform his functions at work" and was "in need of psychotherapeutic intervention to resolve his emotional responses" to 9/11. (Id. 41.) It proposed individual therapy 2-3 times per week and set a target date of January 15,

---

[5] In its reply brief, defendants grudgingly withdraw their entirely baseless argument (D. Mem. 2, 22-23) that Black fabricated the story of his brother-in-law's death. (D. Reply Mem. 2-3.) It is undisputed that Black's wife's brother, an employee of Cantor Fitzgerald, was killed in the destruction of the World Trade Center. Defendants' argument to the contrary is based on their misreading of Black's deposition testimony, which in turn was caused not (as they claim) by Black's vague answers, but by defendants' inept and indirect questions. See Black Dep. Tr. 11-16.)

2004, for meeting a number of specific treatment goals.  (Id. 42.)  The assessment noted that

Black's motivation to return to work was "excellent" and that he was a "highly competent [and]

skilled worker who enjoys his productivity on the job."  (Id.)  This assessment – together with

Dr. Miller's – provides ample "objective medical evidence" that Black's anxiety made him

"unable to perform the material duties of his job."

Pitney Bowes did not, and does not now, question the accuracy or thoroughness of Dr.

Stutman's assessment.  Indeed, it apparently relied on that assessment in granting Black a total

of five weeks of STD benefits.  However, in limiting those benefits to just two weeks beyond the

date of Dr. Stutman's assessment, Pitney Bowes unreasonably ignored and misread the medical

record.  No additional assessment was performed by Pitney Bowes to justify the decision.

Instead, the company relied on a brief report from ValueOptions, which "reviewed" the

diagnoses of Dr. Miller and Dr. Stutman.  (Id. 47.)  That report significantly understated the

evidence regarding Black's condition.  The only symptoms noted in the report are that Black

appears "disheveled" and has "some impairment of long-term memory," the latter being a

mistake, as Dr. Stutman's assessment indicated that Black's memory was "intact" and Dr.

Miller's diagnosis mentions nothing about his memory.  (Compare id. with id. 34, 37).

ValueOptions neglected to address any of the other physical symptoms noted by Dr. Stutman, or

any of the functional impairments, such as the "severe" impairment in Black's ability to perform

complex tasks, make decisions, and plan, and the "marked" impairment in Black's ability to

interact with customers and the public.  (See id. 47.)  The ValueOptions recommendation was

thus based on an inaccurate characterization of Black's actual condition, as described by the two

medical professionals who personally examined him.

Not surprisingly, then, its recommendation that Black return to full-time work in two weeks has no reasonable basis in the record. ValueOptions noted that Black "displays little functional impairment when not having an anxiety attack or panic attack." (Id. 47.) This is correct as far as it goes, as Dr. Stutman indicated that Black is functionally impaired only "when panicked." (Id. 40.) However, the fact that Black was impaired only when panicked made him fit to work only if his attacks were sufficiently infrequent as not to interfere significantly with his overall job performance. A panic attack suffered every now and again might not unduly interfere with the performance of one's job, but at some point frequent debilitating panic attacks would render an employee "unable to perform the material duties" of his job because they would cause him to miss substantial amounts of work and/or to perform unacceptably. ValueOptions did not even address the frequency of Black's anxiety attacks. But the fact that – as Dr. Stutman noted – Black's anxiety-related absences from work were putting his "job in jeopardy" evidences that his attacks occurred with sufficient frequency to make him unable to satisfactorily perform the material duties of his job.

ValueOptions's other justification for the recommendation that Black return to work full-time was that two weeks of disability leave would allow Black adequate time "to prepare for return to work." (Id. 47.) ValueOptions did not justify this conclusion and there is no evidence in the record to support it. (See id.) At the time of his application, Black had been suffering anxiety attacks for almost two years. (Id. 36.) Dr. Miller's letter said only that Black was "unable to perform his job currently" and made no prediction as to when he would be able to do so. (Id. 34.) Dr. Stutman's assessment specified January 15, 2004 – *three months* from the date of her assessment – as a target date for Black to meet treatment goals. (Id. 42.) Neither of these

reports provided a reasonable basis for concluding that two weeks was sufficient time for Black to regain the capability to perform the material duties of his job, and ValueOptions provided no other evidence or explanation for such a conclusion.

Indeed, ValueOptions's two-week recommendation appears to have been a fall-back from its initial recommendation, which was that Pitney Bowes allow Black to work part-time. (Id. 47, 54.) This initial recommendation was itself arbitrary, as it was based on the mistaken belief that Black's anxiety attacks occurred primarily in the afternoon. (See id. 47, 54.)[6] But in any event, ValueOptions abandoned this recommendation after learning that "part[-]time work [was] not available" for Black. (Id. 47, 54.) Having found (albeit on a mistaken premise) that Black could perform his job only on a part-time basis, ValueOptions provided no reasonable justification for its fall-back recommendation that Black be required to return to work full time. Rather than being based on an assessment of Black's medical prognosis or vocational capability, the recommendation appears to have been based on a business decision that Black's job required full-time work. If, as ValueOptions believed, Black was capable only of part-time performance, he was not able to fulfill the material obligations of his job, and was disabled under the terms of the STD Policy. The unjustified change thus further evidences the arbitrariness of ValueOptions's recommendation, and of Pitney Bowes's decision to adopt that recommendation.

Pitney Bowes's subsequent refusal to extend Black's benefits beyond November 5 also lacked a reasonable basis. Again, Pitney Bowes relied on a recommendation from ValueOptions. (See id. 33.) The only new information presented by ValueOptions was a

---

[6] The only evidence of the timing of Black's attacks is contained in Dr. Stutman's assessment, which noted that the attacks occurred "usually in [the] *morning* but also in [the] afternoon or evening." (Id. 36; emphasis added.)

summary of a telephone call with Dr. Miller, who indicated that Black was continuing to experience anxiety, that he was exhibiting "nervousness" and had "difficulty concentrating." (Id. 48.)  Dr. Miller also reportedly conceded that Black was "able to keep an appropriate daily schedule," was "eating and sleeping" without difficulty, was "compliant with treatment," and did not have "suicidal or homicidal ideation."  (Id.)  It is not apparent what relevance these concessions have to the issue of whether Black's anxiety interfered with his ability to work, and ValueOptions did not attempt to explain their relevance in its recommendation.  Nor did ValueOptions follow up with Dr. Stutman, nor address her assessment.  Instead, ValueOptions summarily concluded that "there is no proof" that Black was impaired, and that "complaints of nervousness and difficulty concentrating do not support a request for an extension of disability." (Id.)  Such cursory conclusions – in the face of a thorough medical assessment that directly contradicts them – do not provide a reasonable basis for rejecting Black's application.

Pitney Bowes's consideration of Black's appeal of the denial of STD benefits was no more reasonable.  Dr. Miller's second letter to Pitney Bowes indicated that he believed that Black was unable to "concentrate" or "perform his job effectively," that he was "disabled due to his psychiatric condition," that he was currently under the care of a psychiatrist and receiving medication, and that he needed "one or two months" more disability time in order to resolve his condition.  (Id. 50-51.)  Black also submitted a letter from his dentist, which, while not offering a relevant medical opinion, corroborated the reports of Black's symptoms by providing a first-hand description of one of Black's apparent panic attacks.  (Id. 52.)  Standing alone, these letters are not substantial proof of disability, but they undoubtedly supplement what was already compelling and unrefuted evidence of a disability.

As with the decision to reject Black's initial application, Pitney Bowes's denial of the appeal was not based on any new or contradictory information. Once again, Pitney Bowes does not appear to have reviewed with reasonable care the evidence in the record. Dr. Peter Griffin, a physician consultant for Pitney Bowes, noted in his "[c]linical [s]ummary" that Black submitted a "note from DDS" (the letter from Black's dentist) and a "note from GP" (the letter from Dr. Miller) in support of his appeal. (Id. 49.) Dr. Griffin dismissed the newly submitted information without explanation, echoing the earlier ValueOptions conclusion that the "[l]evel of anxiety does not support extension of STD." (Id.) He made no mention of Dr. Miller's earlier letter, or more importantly, of Dr. Stutman's thorough assessment. Dr. Griffin's failure to consider the medical opinions of Dr. Miller and Dr. Stutman – the only two doctors who actually examined Black – lacked reasonable justification.

Pitney Bowes's evaluation of Black's STD benefits application was thus flawed in a number of respects. The original ValueOptions recommendation was factually mistaken and analytically inconsistent, and it ignored compelling evidence of disability from Dr. Miller and Dr. Stutman. Pitney Bowes's later reviews did nothing but ratify this flawed recommendation. There was no reasonable basis for Pitney Bowes to conclude – contrary to the thorough assessment by Dr. Stutman and the supporting letters from Dr. Miller – that Black was able to peform the material duties of his job. Its own consultant in fact concluded that Black could not perform on a full-time basis, and when the consultant's recommendation that Black be permitted to work part-time met resistance from Pitney Bowes, it failed to adhere to its conclusion that Black could not work full-time, and instead recommended that he be required to do so, in only two weeks. No plausible reason was offered for believing that Black's disabling condition

would improve within that time, and the only professional opinions in the record to address Black's prognosis strongly suggested a much longer period of disability. Accordingly, Pitney Bowes's decision to deny Black STD benefits was arbitrary and in breach of its obligations under the STD Policy.

## III.    Long-Term Disability Benefits

Black's claim for LTD benefits arises under ERISA, which provides a right of action for employees denied benefits under qualifying retirement and disability plans. See 29 U.S.C. § 1132(a)(1)(B). A court reviews such denials "de novo" unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where the benefit plan confers such discretionary authority, a court should not "disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995). Under the "arbitrary and capricious" standard of review, a court may overturn a decision to deny benefits only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. at 442.

Here, the LTD Plan confers upon the Employee Benefits Committee the "discretion" to "interpret and construe" the terms of the plan and to "determine questions of eligibility." Therefore, decisions made by the Committee with regard to the LTD Plan are reviewed under a deferential "arbitrary and capricious" standard.

The Committee rejected Black's application both because of his refusal to undergo the requested IME and on the merits. The unrefuted evidence in the record establishes that the Committee's decision was not arbitrary and capricious. The LTD Plan required the Committee

15

to find Black "disabled" if it determined that he was unable "to perform the material duties of his . . . occupation." (LTD Adm. Rec. 11.) In contrast to Pitney Bowes's decision regarding Black's STD benefits application, the Committee's conclusion that Black did not meet the requirements to be considered "disabled" for purposes of receiving LTD benefits was reasonable and supported by substantial evidence.

Black did submit substantial evidence of disability. His application for LTD benefits included a "proof of claim" form from Dr. Neil Berliner, a psychiatrist, indicating that Black suffered from a "panic disorder" that caused "palpitations, anxiety, hyperventilation, sweating . . . , difficulty concentrating, [and] mid[-]cycle insomnia." (Id. 160.) Dr. Miller also submitted a letter in support of Black's application, which indicated that Black began experiencing "anxiety problems and panic attacks" in February 2002, that he was "currently totally disabled from work," and that Dr. Miller "cannot predict when or if he will be able to return to work." (Id. 96.)

Additionally, as part of Black's appeal, Black submitted a copy of a letter from the Social Security Administration finding him eligible for Social Security disability benefits. (Id. 104.) Black also included a "Psychiatric Narrative Report" from Dr. Berliner. (Id. 102-03.) This report – somewhat more detailed than the one-page proof of claim form submitted earlier – outlined the history of Dr. Berliner's treatment of Black, from March 2002 until the time of the letter. (Id.) The report indicates changes in Black's condition, and details the medicines Dr. Berliner prescribed for Black to control his anxiety and to aid him in sleeping. (Id.) The report notes that as of September 2003 Black was in weekly psychotherapy with a person named Elizabeth Prue, though it does not indicate anything substantive about this treatment or describe

16

Prue's credentials.  (Id. 103)  The report concludes that Black's panic attacks are "under . . . better control since [he] has been in a non-work, lower stress environment" and since the dosage of his medication was increased.  The report recommends "continuation of current treatment and long term disability."  (Id.)

The Disability Department's initial denial of LTD benefits was marred by some of the same mistakes that marred its denial of Black's STD benefits application.  Dr. Griffin's review of Black's application stated that the documentation from Black's "family practitioner" and his "dentist" did not establish a "psychiatric" disability, ignoring the evaluations by Dr. Stutman, a psychologist, and Dr. Berliner, a psychiatrist, that were also part of Black's application.  (Id. 87.)  Dr. Griffin again noted that Black has "work capacity when he is not experiencing anxiety," without addressing the issue of the frequency of his attacks.  (Id.)  And Dr. Griffin explicitly relied on the ValueOptions recommendations regarding Black's STD benefits application – flawed for the reasons discussed above – for his ultimate conclusion that Black's symptoms "do not meet the definition of disability."  (Id.)

Nevertheless, the decision to deny Black's appeal is supported by substantial evidence.  Black's failure to submit to an IME and to provide the information the Disability Department requested of him both constitutes an independent procedural default warranting denial of his application, and provides a basis for a reasonable decision-maker to discount the evidence of disability he provided.  First, Black's refusal to comply with defendants' reasonable requests for information in itself justified denying his claim.  The LTD Plan says the applicant "shall be required to submit initially and from time to time whatever proof or documentation the Disability Department may require."  (Id. 18.)  The plan also states that an employee may be required, as a

17

"condition to the payment of benefits under the plan," to "submit from time to time to an independent medical examination." (Id.) Black failed to satisfy these requirements by refusing repeatedly to submit to an IME and to provide the additional information requested by the Disability Department. Consequently, he had not met an essential "condition to the payment of benefits under the plan."

Black's argument that he was not required to provide such information for his appeal, because the requirements do not apply "after a denial has been issued" (Pl. Reply 4), is without merit. As an initial matter, it is not for the Court to interpret the Plan's provisions de novo. Just as the plan grants the Employee Benefits Committee "discretion" to determine questions of eligibility, so too does it grant the Committee "discretion" to "interpret and construe the terms and provisions of the Plan." (LTD Adm Rec. 26.) Thus, the Committee's interpretation of the terms of the Plan as empowering it to request additional proof during an appeal is entitled to deference so long as it is not arbitrary or capricious.

Black cites no provision from the Plan that suggests a distinction between the Committee's powers prior to an appeal and after an appeal. To the contrary, the relevant provision states that the Disability Department (acting on behalf of the Committee) may require an applicant to submit additional proof "from time to time," suggesting that it may do so at any time: prior to, during, or even after an appeal. There is consequently no basis for finding the Committee's interpretation of Black's obligations under the plan to be arbitrary or capricious.

There is similarly no merit to Black's argument that the Committee may only require submission to an IME following an award of benefits. (Pl. Opp'n 4.) Black rests this argument on Section 5.7(d) of the Plan, which states that benefits may be "suspended or discontinued" for

a participant's failure to attend a scheduled IME.  (LTD Adm. Rec. 20.)  Black argues that, since

benefits can only be "suspended or discontinued" once they have begun, the IME requirement is

"inapplicable where (as here) a claimant is not receiving benefits at the time of refusal."  (Pl.

Opp'n 4.)  Even assuming that Black's interpretation of Section 5.7(d) is correct, however,

Section 5.7(d) is not the only provision setting forth the consequences of failing to submit to an

IME.  Section 5.4(a) also addresses the issue, expressly providing that submitting to an IME

requested by the Disability Department is a "condition to the payment of benefits under the

Plan."  (LTD Adm. Rec. 18.)  Given this clear dictate, it was neither arbitrary nor capricious for

the Committee to refuse to pay benefits to Black based on his refusal to submit to an IME.

Second, even if Black's failure to comply with the Committee's requests were not a

procedural default of his application for LTD benefits, his recalcitrance prevented the Committee

from having "sufficient objective evidence" to evaluate the merits of his claim.  The Committee

reasonably identified a number of gaps in the evidence submitted by Black.  For example, the

Committee noted that Black's submissions did not provide "sufficient medical records" – "such

as test results, physician personal notes, and consultation reports" – to accompany the

submissions from Dr. Miller and Dr. Berliner.  (Id. 213.)  Dr. Miller's letter is just a short

paragraph conveying his conclusion with no documentary evidence to support it, and Dr.

Berliner's "proof of claim" is similar.  (See id. 96, 97.)  Dr. Berliner's "Psychiatric Narrative

Report" is more detailed, but it too is incomplete.  It records the changes in the frequency and

intensity of Black's anxiety attacks and his prescribed medication, but (unlike Dr. Stutman's

earlier assessment) it does not analyze Black's specific functional impairments, the critical issue

in assessing whether or not Black is able to perform the material functions of his occupation.  Dr.

Berliner's ultimate recommendation that Black be approved for LTD benefits rings hollow without any analysis of his ability to perform the functions of his job. Additionally, the Committee noted that Dr. Berliner's report mentions that Black is under the care of Elizabeth Prue, but there is no discussion of the substance of that treatment or its progress, and no report or documentation from Prue. (Id. 213.) The absence of a report from Black's primary therapist provides a substantive basis for the Committee to question the evidence submitted by Black.

As he does with his STD claim, Black places great weight on Dr. Stutman's assessment. But Dr. Stutman's assessment was conducted in October 2003, giving it limited value regarding Black's condition at the time of his LTD benefit claim, in November 2004, or of his appeal, in June 2005. Indeed, Dr. Stutman's recommended course of treatment set treatment goals to be met as early as January 2004, suggesting that she recognized the possibility that Black would be ready to return to work by that time. (STD Adm. Rec. 42.) While Pitney Bowes's failure to consider and respond to Dr. Stutman's assessment of Black was evidence that its STD benefit determination was arbitrary, the Committee's failure to do so with regard to its LTD benefit determination was not.

Finally, in contrast to Black's application for STD benefits, in which Dr. Stutman's assessment provided evidence of Black's disability from a medical professional of Pitney Bowes's choosing, the only evidence of disability submitted in connection with Black's LTD application came from Black's own care providers. This is not to say that the evaluations by Dr. Miller and Dr. Berliner are biased or should be disregarded. But there is nothing arbitrary or capricious about defendants' insisting that Black's application be confirmed by an examination from someone other than his own caregivers, particularly when the LTD Plan gives Pitney

Bowes the explicit right to require such an examination.

Because of inadequacies in the evidence Black provided in his application for LTD benefits, and because of his refusal to submit to an IME, the Committee's decision to deny LTD benefits to Black was neither arbitrary nor capricious and is entitled to deference by this Court.[7]

## IV. Production of Plan Documents

Finally, Black claims that Pitney Bowes failed to comply with 29 U.S.C. § 1024(b)(4), which requires a plan administrator to provide, upon written request by a plan participant or beneficiary, "a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  An administrator who fails to comply with such a request within 30 days "may in the court's discretion be personally liable to

---

[7] Black objects to the Committee's consideration of a report by Dr. Arthur Broder, who reviewed the medical information in Black's file after Black's appeal of the initial denial of his application.  (Pl. Mem. 11-13.)  Dr. Broder told the Committee that Black's medical records "fail to address in a valid, reliable, professional, [and] comprehensive manner whether he is afflicted with any permanently disabling neuropsychiatric disorder(s)."  (LTD Adm. Rec. 91.)  Black contends that consideration of Broder's report violated the requirement that the Committee provide Black with a "full and fair review" of the initial adverse benefit determination, because Black was not given an opportunity to respond to Dr. Broder's report.  See 29 C.F.R. § 2560.503-1(h).  Black relies principally on Abram v. Cargill, Inc., 395 F.3d 882 (8th Cir. 2005), for the proposition that failure to provide such an opportunity denies a participant "full and fair review."

Abram is not binding authority on this Court, and its reasoning has been questioned and rejected elsewhere.  See, e.g., Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1167-68 & n.3 (10th Cir. 2007); Winz-Byone v. Metropolitan Life Ins. Co., No. EDCV 07-238-VAP (OPX), 2008 WL 962867, at *8 (C.D. Cal. Mar. 26, 2008); Skipp v. Hartford Life Ins. Co., No. CCB-06-2199, 2008 WL 346107, at *10-*11 (D. Md. Feb. 6, 2008).  But even if Dr. Broder's report is disregarded, the Committee's decision to deny LTD benefits to Black was not arbitrary or capricious.  For the reasons discussed above, the Committee had ample basis to conclude that Black had not submitted "sufficient objective evidence" of disability without relying on Dr. Broder's report.

such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal." Id. § 1132(c)(1)(B). By letter of March 11, 2005, Black demanded copies of "[a]ll guidelines and protocols used to make the denial determination" in regards to Black's LTD benefit application. (LTD Adm. Rec. 168-69.) Pitney Bowes failed to provide a copy of a "Policies and Procedures Manual" – which sets forth internal procedures to guide Disability Department employees in processing disability claims – until June 28, 2007. (Defs. Resp. to Pl.'s R. 56.1 Statement ¶ 38.)

However, even assuming that the Policies and Procedures Manual is a "guideline" or "protocol" within the meaning of Black's March 11, 2005, letter, there is no merit to Black's claim. The manual is not one of the documents set forth in Section 1024(b)(4). It is plainly not a "plan description," an "annual report," or a "terminal report." Nor is it "the bargaining agreement, trust agreement, contract, or other instrument[] under which the plan is established or operated." While the manual does guide operations at Pitney Bowes for the processing of disability claims, the phrase "instruments under which the plan is . . . operated" refers to "legal documents that govern or confine a plan's operations, rather than the routine documents with which or by means of which a plan conducts its operations." Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 142 (2d Cir. 1997). An internal policies and procedures manual is not such a legal document. See, e.g., Cohen v. Metropolitan Life Ins. Co., No. 00 Civ. 6112, 2003 WL 1563349, *1-*2 (S.D.N.Y. Mar. 26, 2003) (finding that "Best Practices Manual" and "Claims Management Guidelines" are not "instruments" under which a plan is operated). Accordingly, Black has no claim to recover the statutory penalties under section 1132(c)(1)(B).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted with respect to Pitney Bowes's liability for breach of its obligations under the Short-Term Disability Benefits Policy, and denied in all other respects. Defendants' motion for summary judgment is granted with respect to plaintiff's claims under ERISA, 29 U.S.C. §§ 1132(a)(1)(B) and 1132(c)(1)(B), and denied in all other respects. The parties are directed to submit a proposed judgment awarding appropriate damages to Black on or before September 19, 2008.

SO ORDERED.

Dated: New York, New York
      August 26, 2008

GERARD E. LYNCH
United States District Judge